These were three cases tried together and all depending on the same facts. There was a hearing in damages after a demurrer overruled and a judgment in each case for nominal damages only.
The injury of which the plaintiffs complained happened at a grade crossing of the defendant's track in the town of Plymouth known as "Tolles's Crossing." That crossing is in a thinly settled locality. There are two houses within half a mile, at one of which Mrs. Andrews was living, with whom her aunt, Mrs. Smith, who lived in Bridgeport, was then visiting. There were in all four houses within a mile. Ordinarily from two to fourteen teams go over this crossing in a day. At the point of the crossing the general direction of the railroad is east and west; of the highway north and south. The railroad track curves slightly, the inner side to the south. The crossing is dangerous to persons on the highway going north when a train is going east. West of the crossing the view of the railroad from the highway and of the highway from the railroad is obstructed by rocks and embankments. At the time of the injury the obstruction was somewhat increased by vegetation — weeds, bushes and trees — growing within the right of way of the railroad. Such vegetation however caused very slight obstruction to sight and none at all to sound. The whistling post for trains approaching the crossing from the west is fourteen hundred and thirty-six feet west of the crossing measured by the curve of the track, but it is nearer measured in a straight line, but how much nearer is not found. There is another grade crossing a little east of Tolles's Crossing. The distance did not appear. The finding made by the judge of the Superior Court closes as follows: *Page 295 
"On the 20th day of August, 1887, at about one o'clock in the afternoon, Mary E. Andrews, one of the plaintiffs, and Sarah J. Smith, the intestate of the plaintiff Edward W. Smith, administrator, were driving in a buggy on the highway and approaching Tolles's Crossing from the south. Mrs. Andrews was sitting on the right hand side of the buggy holding the reins, and Mrs. Smith on the other side of the same seat. At this time the weekly pay train on the defendant's railroad, consisting of an engine and one car, which was running as the second division of a regular passenger accommodation train, ten minutes behind the first section, was approaching the crossing from the west. Upon the crossing the engine upon this train collided with the buggy, throwing out both occupants, instantly killing Mrs. Smith and very seriously injuring Mrs. Andrews.
"The train approached the crossing at the rate of about twenty-five miles an hour. As the engineer passed the whistling post he commenced blowing the usual crossing whistle, consisting of two long blasts followed by two short blasts. At the same time the fireman commenced ringing the bell, and continued ringing it until the engine had passed the crossing. No other signal was given. The whistle and bell, ii listened for, could have been heard without difficulty by persons approaching the crossing from the south on the highway. Mrs. Andrews and Mrs. Smith possessed ordinary powers of sight and hearing. The engineer was on the side of the engine from which the ladies were approaching the crossing. He was looking ahead along the track. When he first caught sight of the horse the engine was about ninety feet west of the crossing and the horse's head and neck within ten feet of the track. He supposed the team was coming to a stop, but almost immediately he saw the team moving forward, urged as it seemed to him by the action of the occupants of the carriage. He did everything possible to avert the accident by stopping the train, but was so near the crossing that he was unable to stop the engine in time to prevent it. It did stop at a point two hundred and ten feet east of the crossing. He did not again sound the whistle of his engine. The horse *Page 296 
which the ladies were driving was gentle, not afraid of trains, and might have been stopped in time to prevent the accident if the ladies had kept watch along the track after it became possible for them to see the engine.
"It is impossible for me to see how these facts are legally sufficient to justify any finding of negligence on the part of the defendant or any violation of duty on its part. I therefore find that the defendant was not guilty of negligence. And as the conclusion reached, that the plaintiffs are entitled to nominal damages only, is based upon such want of negligence on the part of the defendant, I also omit to find contributory negligence on the part of Mrs. Andrews or Mrs. Smith, although clearly of opinion that a greater degree of vigilance on their part would have averted the accident."
What negligence is in the meaning of the law, and in what cases a finding of negligence or of no negligence by a trial court can be revised by this court, and in what cases such a finding cannot be revised, has been so recently and so fully considered in Farrell v. The Waterbury Horse RailroadCo., (ante page 239,) that we have no occasion to consider it again. We adopt the discussion in that case as a part of the opinion in this.
One claim made by the plaintiffs is, that "the defendant was negligent in that its engineer failed to commence sounding the whistle of his locomotive when the locomotive was approaching and within eighty rods of the crossing as measured along the curved line of the track." The purpose for which the whistle is required to be sounded and the bell to be rung when the train is approaching a grade crossing, is that all persons who are about to cross the track at the crossing may have notice that the train is coming. Doubtless the legislature considered that eighty rods from the crossing was the point from which the signal would be the most effective. Generally this may be true. But in many cases this is not true, as shown by actual experience. Curves in the track and local conformations of the country often so affect the transmission of sound, that the signals, if given at the precise distance of eighty rods from the crossing, *Page 297 
would be of no avail. The purpose of the statute ought not to be sacrificed to its letter. If we assume that it was the duty of the engineer to sound the whistle not further away from the crossing than eighty rods, there is no reason why the distance must be measured by a curved line rather than a straight one. Sound travels in a straight line. It would seem that the straight line was the one to be preferred. There is nothing in the finding to show that by the straight line the point where the whistle began to sound was more than eighty rods from the crossing. After all, the real inquiry is — Was the whistle sounded? Was it sounded in a proper manner, and substantially at the place fixed by law, and at a place where it would be likely to be heard by those for whose benefit it is required ? If so there was no negligence. Upon every one of these particulars the finding is clear and explicit in the affirmative.
As to the other claims made in this case, they are of such a nature that the law neither has furnished nor can furnish a precise and definite rule beforehand as to just what the parties should or should not do in order to avoid liability for their acts or omissions under the facts and circumstances as they occurred, and the general rule of conduct is alone applicable. The law therefore, of necessity, leaves the two questions, what would a man of ordinary prudence have done under the facts and circumstances of this case, and was the conduct of the plaintiff or defendant that of such a man, to the decision of the trier. And provided the facts upon which it is based are properly found, that decision is of necessity final and cannot be reviewed by this court.
But if we were at liberty to review these claims we should be entirely satisfied with the conclusion to which the trial court came. One of the claims is that the defendant was negligent in permitting the weeds and bushes to grow within its right of way, so as to obstruct the view of the approaching trains and so as to limit the opportunity which Mrs. Andrews and Mrs. Smith had to hear the signals of the train. So far as this claim rests upon any obstruction to the bearing it is disposed of by the finding, that being expressly *Page 298 
that the weeds, c., did not obstruct the sound at all. In respect to the opportunity for seeing a train from the highway, the court makes this finding: — "At a point in the highway sixty-seven feet south of the crossing a person sitting in an ordinary buggy could see the top of the smoke stack of an engine one hundred feet west of the crossing. At a point in the highway thirty feet south of the crossing the engine could be seen one hundred and fifty-eight feet west; twenty-five feet south, one hundred and seventy-three feet west; twenty feet south, one hundred and ninety-one feet west; fifteen feet south, two hundred and twenty-six feet west; and ten feet south, two hundred and sixty-nine feet west. These measurements were made in the month of November, when the obstruction to sight from vegetation would be likely to be less than in August; but the court finds not materially less. Mrs. Andrews and Mrs. Smith had a gentle horse, one not afraid of cars. Surely these distances are abundantly sufficient to afford opportunity to see an approaching train in time to remain in a place of safety. If the defendant was negligent in not keeping down the weeds and bushes within its right of way, it was not a negligence that led these unfortunate ladies into a place of danger.
Another claim made by the plaintiffs is, that the engineer did not sound the whistle between the whistling post and the crossing; that the ringing of the bell was not sufficient; that this was a dangerous crossing to persons approaching it from the south and when a train was coming from the west; and that the defendant should have used means of warning commensurate with the danger. The plaintiffs, however, fail to note in this connection that this crossing was but little used. Sometimes not more than two teams a day crossed there and at the most not more than fourteen, so that while the crossing was in itself a dangerous one the aggregate of danger there was very slight — as slight almost as at any country crossing that could be found. The requirement of vigilance is to be measured by the total of danger.
In this part of the case the plaintiffs made another claim which is entitled to careful consideration. It is that after *Page 299 
the engineer saw the ladies and the team he did not do all that he might have done to prevent injury to them. He did not sound the whistle. The bell was ringing all the time. He tried to stop the train and in that particular did the best he could. The claim is that he should have sounded the whistle. The engineer is to be judged by the circumstances as they appeared to him at the time, and not as they appear to others after all the danger is passed and there is time to view the circumstances at leisure. The finding is that the engineer saw the head and neck of the horse when the horse was about ten feet south of the track. The engine was then about ninety feet west of the crossing, moving at the rate of twenty-five miles an hour — say thirty-six or thirty-seven feet in a second. Two and one half seconds was all the time in which he had to act. He had the right to act at first on the presumption that they would conduct themselves with ordinary care. Apart from this general presumption, the movement of the horse indicated that they were about to stop. By the time the horse was again urged forward some part of the two and a half seconds had elapsed. The whistle had been sounded properly, in a manner and at a place where it could have been heard, and the engineer had the right to believe it had been heard by them as they approached the track. The bell was ringing. The noise of the train itself could be heard more than the ninety feet. That they urged the horse forward into certain danger when the train was so near and in their full view, was the first indication to the engineer that they were acting without judgment from alarm or through rashness. Up to that instant he had no call to do anything more than had been done — to sound the whistle or to stop the train. He decided that their rashness would not be checked nor their alarm quieted by more noise. We are unable to say he did not decide rightly. In all other respects he did the best he could.
 There is no error in the judgment appealed from.